MAX EHRENREICH, Respondent, *v.* FOX FILM CORPORATION, Appellant.

First Department, July 1, 1921.

**Malicious prosecution — manager of defendant corporation acted without scope of authority in having plaintiff arrested for larceny — defendant not liable.**

In an action for malicious prosecution against a corporation engaged in buying motion picture films and renting them for exhibition purposes, it appeared that the plaintiff rented a film without authority which was returned to the defendant without injury before being used; that the defendant's manager, with knowledge of the facts, caused the plaintiff to be arrested, and that the plaintiff was indicted and subsequently acquitted on the trial by direction of the court.

*Held*, that the manager's full duty to the defendant corporation was discharged when he ascertained before making the complaint to the magistrate that the film had been returned uninjured, and ascertained all the facts essential for his determination whether the plaintiff should be continued longer in the employ of the defendant, and that in making the complaint thereafter on which the plaintiff was arrested, he was acting without the scope of his employment, and the defendant is not responsible therefor.

SMITH, J., dissents.

APPEAL by the defendant, Fox Film Corporation, from a judgment of the Supreme Court in favor of the plaintiff, entered in the office of the clerk of the county of New York on the 3d day of January, 1921, upon the verdict of a jury for $2,500, and also from an order, entered in said clerk's office on the 31st day of December, 1920, denying defendant's motion to set aside the verdict and for a new trial made upon the minutes.

*Saul E. Rogers* [*Percy Heiliger* with him on the brief], for the appellant.

*Philip B. Adams* [*Reuben Peckham* with him on the brief], for the respondent.

LAUGHLIN, J.:

This action was brought to recover damages for false arrest, malicious prosecution and slander and libel. The cause of action for slander and libel was eliminated on a demurrer for misjoinder of causes of action which was sustained. The issues with respect to the other two causes of action were submitted to the jury, but the verdict was rendered for malicious prosecution only.

The material facts which we regard as decisive are not controverted. The defendant was engaged in buying motion picture films and renting them for exhibition purposes. It maintained exchanges for that purpose in the city of New York and in other cities. It employed one Rosenbluh as manager of its New York exchange. His duties were to supervise the making of contracts with exhibitors, the keeping of its books, the collection of rentals and the giving of orders to the delivery department for the delivery of films in accordance with contracts. The defendant maintained at its New York exchange a delivery room in which its films were kept until delivered to exhibitors. The plaintiff and one Stiegler were in the employ of the defendant in charge of its film room, according to the testimony of the plaintiff, but the manager testified that the plaintiff was only a clerk and that Stiegler was in charge of that room. The defendant maintained a leasing office, referred to as a salesroom, and those desiring to rent films made application there. The leasing contracts were negotiated in the first instance by an employee in charge of that room. When a tentative contract was thus negotiated, a formal one would be presented to the manager, and if approved by him, he would recommend its execution by the president, and if approved by the president, it would be returned to the contract register clerk who would enter it on the register giving it a number, and it would then be given to the bookkeeper, whose duty it was to verify the defend-

ant's ability to deliver the film for the date desired and to enter the number and name of the theatre on the books and deliver the contract to the billing clerk whose duty it was to make out a bill in triplicate and send one copy to the exhibitor, another to the delivery room and to retain the third. According to the testimony presented by the defendant those in charge of the delivery room had no authority to deliver a film until they received such a bill for the delivery thereof, with the exception that if it was only desired to exhibit the film for a single day, the bookkeeper would make out a bill therefor, and the agreed price would be paid to and the bill receipted by the cashier, and the copy would be taken by the exhibitor or his representative to the delivery room window and delivery would be made thereon; and even in such instances, unless the delivery was absolutely urgent, the approval of the manager or assistant manager would first be obtained, and where that was dispensed with, the transaction would be presented to the manager or assistant manager within an hour or two for approval, and no one was otherwise authorized to deliver a film, and the plaintiff had no authority in any circumstances to contract for the defendant for the use of a film. The plaintiff did not deny that this was the general rule and custom, but he testified that on a holiday when no one was there to make a contract and an exhibitor called to book a film, he or Stiegler would make the contract, receive the money and deliver the film. The plaintiff further testified that on June 8, 1918, which was Saturday and became a holiday after twelve o'clock, one Barnatan, who was in the employ of the Pioneer Film Company, which had its office on the floor above in the same building, came down to the film room at about a quarter or ten minutes before twelve o'clock and stated that he had a private exhibition at which he wished to show a print of Cleopatra and requested him to use his influence to enable him to get the film a little cheaper than the regular price, to which the plaintiff assented and asked Barnatan what he was willing to pay, and Barnatan replied that it was a private exhibition and he thought he could only afford to pay forty dollars, to which the plaintiff answered that he would see what he could do for him; that he then called the bookkeeping department on the phone

to speak to the bookkeeper, who, he was informed, was out for luncheon, and that he then agreed to let Barnatan have the film for forty dollars on the understanding that if the transaction was not approved he would get it back, and that he accepted the forty dollars and delivered the film at about twelve o'clock; that it was the custom in such case for him to call the booking office and ask whether the film could go out at the price offered; that about fifteen minutes after delivering the film to Barnatan he called the assistant manager on the phone and in substance informed him of the transaction, and on the assistant manager's objecting on the ground that forty dollars was too cheap, he stated to the assistant manager that he would get the film back and that Barnatan could come down and talk with him; that he then went upstairs and returned the forty dollars to Barnatan and received the film and placed it in the first empty vault in the film room about fifteen minutes after he took it out; but that it had not been in the vault before he delivered it to Barnatan and he obtained it for such delivery from the examining room where it had been left for examination; that on delivering the film to Barnatan he made out a slip on the regular printed form according to custom and pinned the forty dollars on it and put it on the file in the film room where such slips are kept for record; that he took the forty dollars from the slip to return to Barnatan, but left the slip; that after so returning the film he went to luncheon, returning in about twenty minutes, when he was informed that the manager desired to see him in the office of the Pioneer Film Company; and he was there asked about the film, and he explained what he had done including his conversation with the assistant manager; and he was asked what he wanted to do with the forty dollars, to which he replied that he intended to put it in the cashier's office the same as he had done a number of times on a holiday when no one was in the office and an exhibitor was in urgent need of a film, and that he thought it was the regular thing to do, the same as he had done before, and that the manager then stated that what the plaintiff did before was all right, but in this case he was not supposed to do it, and that if the exhibitor had more money he should not have made the sale; that after some further discussion as to whether or not the

film was stolen, in which he asserted that it was not and that he had made a record of it, the manager directed that a detective be summoned; that the manager stated to the detective that the film was supposed to be stolen, and the witness explained what he had done and how he had procured and returned the film, and the manager directed the detective to take Barnatan and Latell, another employee of the Pioneer Film Company who had sent Barnatan for the film, down to the detective bureau, and that the detective said that he would not do so " unless we have Max [meaning plaintiff] along," and that the manager then said that the plaintiff had no intention of stealing the film; but on the detective insisting that he could not take the others unless he took the plaintiff, the manager requested the plaintiff to go along with them and promised to go over and see that the plaintiff got out, and that upon the insistence of the manager he accompanied the detective and the others to the detective bureau, and the manager promised to go down later; that after being held at the detective bureau for about an hour and a half he was taken before a lieutenant and gave his name and address, and the detective informed the lieutenant that the charge was stealing the print Cleopatra; that the manager did not appear and he was taken to the Centre street police headquarters in a patrol wagon and his pedigree and finger prints were taken, and he was locked up in the Tombs over night and the next morning was taken to the Fifty-third street Magistrate's Court in a patrol wagon, and there on an information filed by the detective predicated on information derived from the defendant's manager the plaintiff, Barnatan and Latell were charged with having willfully and feloniously stolen the film which was valued at $500, and plaintiff was held in $1,000 bail, which he gave that evening, and the examination was postponed until the twelfth of June; that on the twelfth of June Stiegler made a deposition before the magistrate charging the plaintiff with the crime, and the defendant's manager made a deposition to the effect that the facts charged in Stiegler's affidavit were true. It appears that there was an examination before the magistrate, but it is to be inferred that it consisted in taking these depositions. It resulted in the plaintiff's being held for the grand jury. The plaintiff was

subsequently indicted in the Court of General Sessions and pleaded not guilty, and four months later he was tried and a verdict of acquittal was directed by the court.

On the part of the defendant testimony was presented tending to show not only that the plaintiff was without authority to lease the film but that he entered into a corrupt agreement with Barnatan and Latell for secretly leasing it without the knowledge of the employer of any of them and for their own benefit, and that they were to share in the rental received therefor. But the fact stands uncontroverted that the defendant's manager knew that the film had been returned uninjured before the plaintiff was arrested and before the manager made the charge on which he was prosecuted. There is no evidence tending to show that there was any intent on the part of the plaintiff or of the others who were jointly charged with him with theft, to steal the film otherwise than by depriving the defendant of the possession thereof for that Saturday afternoon. According to the testimony offered in behalf of the defendant and to its theory of the case they intended to appropriate the film to their own use for that brief period of time, which would undoubtedly constitute larceny under section 1290 of the Penal Law, but since the plaintiff intended to restore the film and restored it before the defendant's manager made the complaint to the magistrate, the manager was chargeable with knowledge that the plaintiff had a complete defense to the charge. (Penal Law, § 1307.) We are not, however, concerned with any question relating to the liability of the defendant's manager to the plaintiff for malicious prosecution, for the first point presented for decision is whether the acts of the defendant's manager in making the charge before the magistrate were authorized by the defendant or were within the scope of his employment. There is no evidence of express authorization or ratification. It was doubtless his duty to protect the property of the defendant and to recover any of it unlawfully appropriated or taken from its possession. We are of opinion, however, that his full duty to the defendant in the premises was discharged when he ascertained before making the complaint to the magistrate that the film had been returned uninjured and had ascertained all the facts essential for his determination whether the plain-

tiff should be continued longer in the employ of the defendant if that duty devolved upon him, and that in thereafter making the complaint before the magistrate he was acting without the scope of his employment by the defendant, and it is not responsible therefor. (*Wolff* v. *United Drug Co., Inc.*, 229 N. Y. 537.)

It follows that the judgment and order should be reversed, with costs, and the complaint dismissed, with costs.

CLARKE, P. J., PAGE and MERRELL, JJ., concur; SMITH, J., dissents.

Judgment and order reversed, with costs, and complaint dismissed, with costs.